VINCENT C. McCUE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McCue v. Commissioner
Docket No. 6517-77.
United States Tax Court
T.C. Memo 1983-580; 1983 Tax Ct. Memo LEXIS 210; 46 T.C.M. (CCH) 1450; T.C.M. (RIA) 83580; September 20, 1983. *210 Held: Petitioner's gross income and deductions determined; additions to tax under secs. 6653(b) and 6654, I.R.C. 1954, found. Keith A. Clark and James Curtis Wood, for the petitioner. Melvin E. Lefkowitz and Joellyn R. Cattell, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined the following deficiencies and additions to the tax in petitioner's Federal income tax for the years 1964, 1965, 1966, 1967 and 1968: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
Sec. 6654
1964
$12,454.91
$6,227.46
$348.71
1965
12,800.48
6,400.24
358.40
1966
13,892.92
6,946.46
389.00
1967
20,415.11
10,207.56
653.28
1968
20,409.64
10,204.82
636.35
The amounts of deficiencies are based upon respondent's reconstruction of petitioner's income and deductions for the years in issue, which resulted from a lengthy audit process. Although many of the items of income and expense have been agreed upon by the parties, some of them are still in dispute. The parties agree on the basic amount of gross income petitioner derived from his *211 horse racing business but disagree on his gross income from his insurance business, with petitioner claiming he should be allowed to exclude amounts that he paid over to sales managers under his supervision. Deductions that are still in dispute relate to: (1) Automobile mileage, air fair, meals and lodging; (2) bonuses, prizes, and other incentive awards paid by petitioner to sales managers and agents under his supervision; (3) business use of home; and (4) expenses incurred by petitioner in his horse racing business. We are primarily asked to decide whether petitioner has substantiated deductions greater than those allowed by respondent. We must also decide whether certain of these expenses were ordinary and necessary business expenses. If we find deficiencies against petitioner, we must proceed to determine whether he is liable for the additions to the tax under section 6653(b) for fraud and under section 6654 for failure to pay estimated tax. If we hold for petitioner on the fraud issue, we must consider whether he is liable for the delinquency (section 6651(a)) and negligence (section 6653(a)) additions to the tax, which respondent raised in his amendment to answer as an alternative *212 to the section 6653(b) addition. Because the issues are largely factual, we have combined our Findings of Fact and Opinion. Some of the facts have been stipulated and are so found. It has been stipulated that petitioner resided in Camp Hill, Pennsylvania, when the petition in this case was filed. Petitioner has worked with the Combined Insurance Company of America (hereinafter CICA) since 1952 when he started as a sales agent. He soon became a very successful sales manager, and in 1954 or 1955 was made responsible for sales in Pennsylvania. He built up the sales department in that state and became a district manager, with sales managers and agents under his supervision. From 1964 until October 1967, the territory supervised by petitioner as district manager was 33 counties in eastern Pennsylvania, excluding Philadelphia. In 1964, he had only 10 or so managers and agents working under him, but by late 1967 he had increased his sales force to 30. In October 1967, CICA reduced petitioner's territory to 13 counties. The number of individuals he supervised was likewise reduced to 14, but he proceeded to rebuild his sales force and volume. Expenses for Automobile Travel, Meals *213 and Lodging
As district manager, petitioner's primary duties were to hire, train and motivate sales managers and agents in his territory. He spent only a minimal portion of his time on selling insurance himself because his supervisory activities were so time consuming. There was a constant turnover in personnel, generally over 200 percent annually during the years in issue; therefore, locating, hiring and training agents was a constant job. To hire new personnel, it was standard practice to rent a motel room in a particular locality for a period of three to six days and to interview applicants, who would be attracted through advertisements run in local newspapers ahead of time. It was typical for petitioner to conduct one hiring campaign each month. Petitioner believed it necessary constantly to motivate his sales managers and agents. On almost every working day, he held motivational meetings at breakfast with groups of managers and agents in different areas in his district. Following a breakfast meeting, petitioner, if he was not involved in a hiring campaign, would meet with sales managers, supervise selling campaigns in targeted cities, or oversee agents in their sales activities. *214 Every Monday night petitioner conducted a training session. The location of these sessions varied throughout the district, although they would be held in petitioner's home if the area where he was working at that time was nearby. Luncheon or dinner meetings in rented banquet facilities were also held on a monthly basis, except when the sales managers and petitioner had to attend regional meetings. Regional meetings were particularly frequent in the earlier years in issue, when they were usually held at the CICA home office in Chicago, Illinois, or in Ohio or Michigan. Because of the size of the territory he supervised, as well as his need to attend out-of-state CICA meetings, petitioner had to travel extensively, particularly before the reduction of his territory in October 1967. He generally used his automobile for business travel six days per week and stayed overnight in motels on several weeknights. The parties have stipulated to minimum automobile expenses that should be allowed to petitioner. These include depreciation, maintenance, interest and insurance based on 80 percent business use of one automobile and gasoline purchases based on travel of 25,000 miles per year *215 at 3 cents per mile. The parties have also stipulated to the minimum amounts of deductible expenses for lodging, meals, and entertainment, most of which were supported by receipts or other records presented to respondent. Petitioner argues that he incurred higher travel expenses in each of these years. Petitioner asks that, using the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), we find his annual business mileage to have been at least 30,000 miles per year. This we cannot do. First of all, the only thing presented on this point is petitioner's unsupported estimate that he drove 40,000 to 45,000 miles per year, and the testimony of Thomas W. Hansen, CICA's Assistant to the National Sales Manager, that petitioner probably traveled 30,000 to 40,000 miles or more per year. But Mr. Hansen readily admitted he was just guessing, based on his own experience and the distance covered by petitioner. Petitioner did not testify as to specific trips that he took and he kept no diary of expenses, travel log or records or odometer readings. In view of the lack of records, respondent's allowance of 25,000 miles of business travel seems reasonable, indeed generous. Furthermore, *216 section 274(d) applies to business travel away from home overnight, which included much of petitioner's business mileage, at least during the earlier years in issue. Smith v. Commissioner,80 T.C. 1165 (1983). This provision supersedes Cohan v. Commissioner,supra.With respect to each overnight business trip, section 274(d) requires substantiation by adequate records or by sufficient evidence corroborating the taxpayer's own statement. Petitioner has admitted he never kept adequate records and has not submitted any evidence corroborating his own estimate that he traveled in excess of the 25,000 miles per year allowed by respondent. Petitioner has the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). He has not carried his burden. We therefore deny any additional deduction for automobile business expenses. At trial, petitioner's position was that an additional allowance for meals and lodging while staying overnight on travels throughout his district should be granted based upon his testimony as to the number of days away from home and the average cost per day. On brief, no argument is developed with *217 respect to the estimation of expenses for meals and lodging while away from home overnight. We assume he has conceded this issue. At any rate, it is clear that section 274(d) precludes the Court from allowing him any additional deduction for meals and lodging not supported by documentary evidence. [2]
Petitioner contends that we should allow additional deductions because of his routine payment for meals of others at the daily motivational meetings and monthly luncheon or dinner meetings. All we have in support of these expenditures is petitioner's uncorroborated testimony, which does not focus on any particular expenses.On the basis of rough estimates for these types of expenses, based solely on his own testimony and extrapolation from the few receipts for business meals that he had, petitioner asks that we compute the average annual business meals expense and allow it as an additional deduction, at least to the extent it exceeds the stipulated expenses for *218 meals and lodging. Although we see no reason to disbelieve petitioner's testimony that he personally paid for most of these business meals, we cannot allow an additional deduction based only on his testimony. Petitioner argues that the substantiation requirements of section 274(d) do not apply here but he is clearly wrong. Section 1.274-2(f)(1) and (2)(i), Income Tax Regs., explicitly provide that business meals are subject to the substantiation requirements of section 274(d) to the extent provided in section 1.274-5, Income Tax Regs. Petitioner has completely failed to satisfy the substantiation requirements for this category of expenses. Hiring Expense
Petitioner claims additional deductions for the monthly cost of renting motel rooms used to conduct hiring programs. The parties have not contended that section 274(d) applies to this type of expense so the absence of an expense diary or receipts is not automatically fatal to the allowance of a deduction. We accept petitioner's testimony, corroborated by that of Mr. Hansen, that he conducted hiring programs on a monthly basis, which required rental of a motel room for three to six days each month. However, due to the absence *219 of specific records or testimony, we are once again left largely to conjecture as to the amounts spent for motel rooms. Petitioner's inability to recall all the particular motels used for hiring, the dates of the hiring programs and the cost of the motel rooms is understandable given the roughly 15 years that have elapsed since the years in issue, but this does not help him carry his burden of proof. He specifically identified several receipts which related to motels used for hiring programs. It might be possible to use these expenditures, to which respondent has agreed, as a guide in estimating the average annual expenses of this type. Petitioner has not shown, however, that he personally paid all the hiring expenses. There is evidence suggesting that he sometimes charged sales managers for one-half of these expenses. Respondent has stipulated to allowance of many lodging expenses for which receipts were provided. Some of these lodging expenses allowed by stipulation undoubtedly were for motel rooms used for hiring rather than for petitioner's own sleeping quarters. While we have a great deal of latitude in applying the rule of Cohan, we must be satisfied that "'at least the *220 amount allowed in the estimate was in fact spent or incurred.'" Afshar v. Commissioner,T.C. Memo. 1981-241, affd. in an unpublished opinion 692 F.2d 751 (4th Cir. 1982), cert. denied     U.S.     (May 16, 1983). Any additional allowance would be sheer guesswork on these facts. Petitioner must bear the consequences of his record keeping delinquency. Overwrite Income
Petitioner was not an employee of CICA but was an independent contractor, as were all the sales managers and agents working under him. Because they were all independent contractors, CICA withheld no taxes and issued no Forms W-2 to them. CICA did issue, however, to each sales manager and agent a Form 1099 reflecting that individual's commission income on policies personally written during the year. CICA also issued a Form 1099 to petitioner in each of the years, which showed the total earnings paid to him by CICA. Respondent used the amounts reported on the Forms 1099 as petitioner's gross income from the insurance business in each of the years in issue, except for 1966, for which a Form 1099 could not be located. For 1966, respondent reconstructed petitioner's gross income by using amounts recorded on an earnings *221 report prepared by CICA. Petitioner claims that approximately one-third of the amounts recorded on the Forms 1099 and paid to him by CICA were paid over by him to his sales managers as their compensation. [3] *222 Petitioner claims that the amounts paid to his sales managers should either be excluded in computing his gross income or subtracted from gross income in arriving at taxable income. We find that petitioner paid to his sales managers a substantial portion of the amounts he received from CICA and hold that his gross income should be reduced accordingly. Petitioner's credible explanation of the compensation arrangement he had with sales managers who worked for him, which was confirmed in important respects by the testimony of CICA officials, establishes that his main source of income was through overwrites based on total premiums collected in his district. Petitioner had a favorable contract with the company, which allowed him an overwrite equal to slightly less than 15 percent of the premiums paid on policies written by agents he supervised. Sales agents received as commission 40 percent of the premiums they collected. They gave the other 60 percent to petitioner, who would retain approximately one-quarter of this amount as his overwrite.Thus, of every $100 paid by an insured, the agent would keep $40 and petitioner would keep $15. Only $45 would be sent to the company. Sales managers did not retain any portion of the premiums, except on those policies they personally sold. Nor did the sales managers receive compensation *223 directly from CICA. CICA officials explained that it was each district manager's responsibility to pay part of the overwrites he received to his sales managers unless direct accounts for the sales managers were established with the company, which petitioner had not done. Canceled checks and entries on ledger sheets maintained by Mrs. McCue support petitioner's testimony that he shared with his sales agents the overwrites paid to him but they do not establish the amount. Petitioner explained, and we believe him, that his sales managers were compensated by his paying them approximately 5 percent of the premiums collected by agents they supervised. This represents approximately one-third of the overwrites received by petitioner. Mr. Donald McDonald, CICA's vice president and treasurer, explained that the Form 1099 issued to a district manager would include amounts that had been paid over to sales managers in his district unless the district manager provided the company with sufficient documentation. Mr. McDonald believed petitioner never furnished such documentation during the years in issue, which comports with his history of failing to submit paperwork unless constantly pressured. *224 On this record we find that petitioner has carried his burden of proving that approximately one-third of the overwrites paid on policies sold by agents in his district went to the sales managers, not petitioner. [4]
Mr. McDonald explained that a district manager's earnings reported on a Form 1099 would consist of three components: overwrites, commissions, and prizes and bonuses. Since petitioner spent only a minimal portion of time on his own sales, it appears that not much of his income was attributable to commissions. There is no testimony to establish what portion of his income was from bonuses or prizes, but it is reasonable to assume he received some because he was recognized as a highly successful manager. Still, by far most of his insurance earnings were from the overwrites. The figures *225 on the 1966 earnings report bear this out.On this basis, we conclude and find that 30 percent of the amounts recorded on the Forms 1099 should be excluded in computing petitioner's gross income for 1964, 1965, 1967 and 1968 because they represent amounts he paid over to sales managers as their shares of the overwrites. Petitioner's Payment of Agents' and Sales Managers' Expenses
The next issue concerns petitioner's claim that he paid some of his sales managers' expenses. Respondent opposes the deduction of these expenses on two grounds: (1) That they were not ordinary and necessary because petitioner was not contractually obligated to pay these expenses, and (2) lack of substantiation. We believe it is clear these expenses, under the facts herein, were ordinary and necessary and should be allowed to the extent established under Cohan v. Commissioner,supra.
As with the other deductions, we have only meager records. Petitioner did not personally maintain any records relating to his insurance business, but his wife, who had received bookkeeping training from CICA, kept certain records that were required by the company. These included ledger sheets showing running balances of sales *226 managers' debits and credits with petitioner. Among the types of expenses recorded on the ledger sheets as debits to a sales manager's account with petitioner were monthly fees for the CICA security program (the agent's own accident and health insurance), charges because of canceled policies on which overwrites and commissions had previously been paid, and charges for the sales managers' share of expenses for meetings, training, etc. Credits on these ledger sheets were primarily for overwrites and bonuses paid by petitioner to the sales managers. CICA did not maintain any detailed records of the expenses of individual agents or managers, but it did issue to petitioner monthly statements which reported the credits and debits, broken down by category of expense, for petitioner's entire district. Generally, these monthly statements do not record whether expenses were incurred by petitioner or by one of the sales managers or agents under his supervision. Petitioner explained that he was not reimbursed by his sales managers and agents for many of the expenses that the company charged to him on the monthly statements. He stated that he routinely paid for all supplies and expenses relating *227 to hiring and training billed to him by the company. However, our review of the ledger sheets maintained by Mrs. McCue reveals that he sometimes billed sales managers for one-half of training expenses. Each monthly statement included a charge to cover the participation of the agents and managers in petitioner's district in the company's security program (which appears to have cost approximately $20 per person). Petitioner testified that he would collect these charges from the agents and managers, as well as amounts due for canceled policies and agents' license renewal fees if it did not require too much harassment. However, when he found collection to be difficult he would motivate the agent by agreeing to pay the charge himself if the agent succeeded in meeting a sales goal, e.g., selling 50 policies in a week. He also explained that many of the amounts charged to him by the company for the security program could not be collected because they related to agents no longer licensed with the company. Petitioner's tardiness in submitting required paperwork kept these agents on the company's rolls. We note that the ledger sheets kept by Mrs. McCue show substantial monthly debits *228 to sales managers' accounts for the security program, which suggests that the responsibility for collecting these amounts was often, if not routinely, passed on to the sales managers.
Overall, we believe that petitioner was not reimbursed for some of the expenses charged to him by the company on the monthly statements, but his lack of records in this area makes it extremely difficult to determine the precise amount of unreimbursed expenses. Under Cohan v. Commissioner,supra, but bearing heavily against petitioner because of his failure to keep and submit better records, we find he was not reimbursed for 25 percent of the amounts charged to him on the CICA monthly statements, which are listed in Exhibit 10-J. Respondent contends that we should disallow the deduction of unreimbursed expenses on the ground that it was not ordinary and necessary for a district manager to pay these expenses. The standard sales manager's contract provided that CICA was not responsible for any expenses of the sales manager, such as licensing fees of the sales manager or agents under his supervision, transportation, and training, and that the sales manager would reimburse the company if it paid for any *229 of these expenses. Petitioner had no contractual liability to reimburse his sales managers for any of the expenses they incurred, and he had the right to charge them for any of the expenses showing up on the monthly statements from the company which the company paid on behalf of them or their agents. The testimony of CICA officials establishes that it was company policy that the district manager would not be responsible for expenses of his sales managers and agents, and that most district managers were reimbursed by their agents and sales managers on a weekly basis for expenses that were charged to the district manager by the company. However, the testimony of the CICA officials also shows that there was no enforcement of this official policy. The company never verified whether particular district managers did so, and in that respect each district manager had great latitude in deciding whether to seek reimbursement. Petitioner was not an employee of CICA but was an independent contractor, as were the agents and sales managers he supervised, and it was up to them to settle their financial accounts. We find that as a practical matter petitioner had considerable discretion in deciding *230 whether to seek reimbursement from his agents and sales managers, and that this practical discretion was not in conflict with the company policy as actually enforced. Petitioner has given us logical and readily understandable reasons why he sometimes chose to relieve his agents and sales managers from the duty of paying all their own expenses. His proven success with CICA as a district manager and his reputation as an innovator suggests his policy of forgiving many of the expenses produced favorable results. On this basis, we find that petitioner's assumption of expenses for which he could have sought reimbursement was ordinary and necessary. Advances, Guarantees and Bonuses Paid to Sales Managers and Agents
Petitioner submitted 144 checks written to sales managers and agents. Many of these checks have no notation indicating the purpose of payment. He claims these payments were for overwrites, advances, guarantees and bonuses and should be allowed as additional deductions. Since we have already allowed an exclusion from gross income on account of the overwrites, based on our estimate of the total overwrites paid to sales managers, no additional deduction should be allowed for *231 specific overwrite payments evidenced by any of these checks. We similarly see no reason why any additional deduction should be allowed for advances since advances appear to have been simply a means of prepaying overwrites to sales managers. The entries in the ledger sheets kept by Mrs. McCue confirm this impression. Mr. McCue explained that it was common practice for managers to give guarantees to newly hired sales agents. Under this arrangement, the manager guaranteed that the agent would earn a specified amount in commissions within a set time period. If the agent made les commissions, the manager would pay the shortfall out of his own pocket. Such an expense would certainly be deductible to the manager, but petitioner testified that he seldom had to pay guarantees since it was generally the sales managers who were responsible for hiring new agents. Of the checks submitted by petitioner, only two, number 1590 for $25 and number 504 for $48, indicate they were payments for guarantees. We will allow additional deductions for these amounts and also for the payments of additional guarantees reflected by the copies of handwritten receipts submitted as Exhibit 14. Bonuses were *232 a far more substantial expenditure for petitioner. Mr. Hansen indicated that it was the general practice for district managers to implement some form of bonus system to stimulate sales within their districts. Petitioner claims he paid his sales managers substantial bonuses in addition to their overwrites and any bonuses or prizes they received directly from CICA. Petitioner claims many of the checks he has submitted reflect his payment of bonuses. Indeed, several of them bear a notation that they are for bonuses. The copies of petitioner's agreements with Al Cohen, one of his sales managers, confirm that he agreed to pay bonuses when production goals were met. Entries on the ledger sheets show periodic bonus payments to Mr. Cohen and other sales managers. The ledger sheets appear to be the most complete record of bonuses paid to sales managers prior to mid-October 1967, and we will allow deductions for any bonuses credited to managers on these ledgers. For the subsequent period, we must rely on the checks, which apparently are not as complete a record, largely because many of them do not indicate the purpose of payment, i.e., overwrite or bonus. Because most of the checks seem *233 to be attributable to overwrites, and because petitioner has little ground to complain about his own failure to keep sufficient records, we will allow additional deductions for bonuses to sales managers from October 1967 through 1968 only for those checks specifically bearing a notation that they are for bonuses. Petitioner testified that in addition to giving bonuses to sales managers, he routinely gave out small prizes such as jewelry or neckties and occasionally large prizes such as a mini-bike or a washer/dryer to sales agents who met goals he set for them. He estimated his cost for the small prizes as $8 to $10 per week, but gave no indication of the expense for the large prizes other than mentioning that the washer/dryer, for which he had a canceled check, cost $300 and that a used console TV that was also awarded cost $600. Once again, we must resort to the rule of Cohan v. Commissioner,supra,, because of petitioner's failure to present documentary evidence. [5] *234 Using our best judgment, we find that the total cost for all the prizes to agents, large and small, was $600 per year, for each of the years. Business Use of Home
Petitioner may deduct under section 162 his ordinary and necessary business expenses, but under section 262 his personal, living or family expenses are not deductible. The regulations reconcile the inherent conflict that arises where a taxpayer uses a portion of his home or business purposes by providing: If, however, he uses part of the house as his place of business, such portion of the rent and other similar expenses as is properly attributable to such place of business is deductible *235 as a business expense. [Sec. 1.262-1(b)(3), Income Tax Regs.] [6]
Petitioner thus must show not only that a portion of his home was used for business purposes, but he also must demonstrate the portion of his residence that was so used. [7] *236 The deduction for allocable business use is computed by reference to the ratio of time or space devoted to business as compared with total use. International Artists, Ltd. v. Commissioner,55 T.C. 94, 105 (1970). The parties have stipulated that at least one-eighth of petitioner's home was used for deductible business purposes, which entitled him to deduct at least one-eighth of the expenses for utilities, real estate taxes, interest on the home mortgage, insurance and depreciation during the years in issue.It is also stipulated that petitioner is entitled to depreciation deductions for 1965 through 1968 with respect to a conference room built in the basement of the house in 1965. Petitioner contends that more than one-eighth of his house was used for business purposes. He asks that we allow deductions in 1964 based on business use of one-seventh of the house and in 1965 through 1968 based on business use of one-third of the house. *237 On brief, respondent has conceded that petitioner is entitled to deduct one-fourth of the expenses in the years 1965 through 1968. During the years in issue petitioner resided in a ranch style house, which had seven rooms on the ground floor. It also had a basement under the entire house. In 1964 the basement was unfinished and not used by petitioner or his family except for storage of old business records and supplies, and a small portion where the washer and dryer were located was used as the laundry area. One of the rooms on the main floor was petitioner's office, which was used exclusively for business purposes. Petitioner described the office as good sized, but could not give its exact dimensions. He estimated that it occupied one-seventh or one-eighth of the square footage of the home. We have no other evidence of the size of the office. In view of this testimony, we find that petitioner has failed to carry his burden of proving that more than one-eighth of the house was used for business purposes in 1964. To meet the constant need for a place to conduct training sessions and other meetings, petitioner had a conference room constructed during 1965 in one-half of the *238 basement. This room was used exclusively for business purposes in the years 1965 through 1968. Both Mrs. McCue and petitioner stated that the conference room occupied approximately one-half of the basement. The other one-half was used for storage and laundry. [8] After inspecting the house subsequent to issuance of the statutory notice, the revenue agent estimated that no more than one-fourth of the total floor space of the entire house, including the basement, was devoted to business use. Petitioner had failed to substantiate that any greater area of the house was used for business purposes. Therefore, based upon respondent's concession on brief we find that petitioner is entitled to deduct for business purposes in 1965 through 1968 one-fourth of the expenses for utilities, real estate taxes, interest, insurance and depreciation incurred in these years for his residence. Horse *239 Racing Business
In addition to being a CICA district manager, petitioner was in the horse racing business during the years in issue. He owned several horses at any given time an had them entered in races, generally in the Northeastern and Middle Atlantic states.The stipulation recognized that petitioner realized short-term capital gain on the sale of two horses and a short-term capital loss on the sale of another horse during the years in issue. Petitioner bought and sold other horses during the years in issue but respondent has charged him with no income or loss with respect to them, apparently because of the lack of records relating to the sales. In addition to income from the sale of horses, petitioner derived income from purses won by the horses at race tracks. He kept no formal books and records with respect to his income or expenses from horse racing. In reconstructing petitioner's income and deductions with respect to horse racing, respondent has relied on receipts and other records uncovered during the examination.
The parties have stipulated to the amounts petitioner received as income from horse racing in each of the years in issue. They have also stipulated to minimum *240 amounts of deductions for various expenses incurred in owning and racing the horses, such as fees to jockeys, trainers, and veterinarians. The stipulation recognizes, however, that petitioner has reserved the right to argue for greater deductions for horse racing expenses. Petitioner has tried to do this by introducing a score of checks written by him or his wife, and several statements from tracks where horses he owned were raced. We have made a painstaking review of these records and evaluated them in the light of the testimony of petitioner, his wife and two of his trainers. Our review was made all the more difficult by the failure of petitioner to lucidly explain how the testimony supported each of the claimed expenditures. We have done the best we could with the disorganized records presented to us, bearing in mind, however, that petitioner bears the burden of proof and that the paucity of records is of his own making. Petitioner's testimony is not entirely clear but is sufficient to establish that during the years 1964, 1965 and 1966 he individually owned horses and individually paid trainers, jockeys, etc. For 1967 and 1968, he stated that he formed a joint venture with *241 his wife, Arthur Steiner, and John Lenzini, who was a trainer. The horses were registered in the name of Mrs. McCue, and Mr. Lenzini acted as authorized agent, whereby he was able to withdraw funds at his discretion from horseman's accounts at the tracks where the horses were stabled. How this "joint venture" operated was not at all clear from the record. It appears, though, that petitioner was personally responsible for paying expenses, at least with respect to some of the horses.Among these expenses were fees paid to Mr. Lenzini as trainer. Since Mr. Lenzini was one of the trainers during all the years in issue and he billed petitioner monthly for his services, as well as for reimbursement for expenses that he had to pay, it is reasonable to assume, as has petitioner, that checks written to Mr. Lenzini represent deductible horse racing expenses. We find that petitioner is entitled to deductions with respect to the seven checks paid to Mr. Lenzini between December 1964 and September 1965, which are included in Exhibit 18. These checks were issued approximately monthly, which comports with our finding that they represented fees paid to the trainer. Petitioner introduced five monthly *242 statements issued by Mr. Lenzini for horses in the name of Mrs. McCue covering the months April through August 1968. These statements recorded expenses for trainer's fees, blacksmithing, and other expenses. Both petitioner and Mr. Lenzini testified that Mr. Lenzini was promptly paid by petitioner the total amounts on these bills. Statements from the horseman's accounts in Mrs. McCue's name at several tracks where the horses raced during this period bears out this testimony. Accordingly, we find that petitioner is entitled to an additional deduction in 1968 for the total amount of expenses recorded on these five statements from Mr. Lenzini. Petitioner asks that we allow deductions for amounts listed as debits on a 1966 statement of his horseman's account with the Delaware Racing Association. He points specifically to three debit entries to Mr. Lenzini and one to Mr. Torres, one of his jockeys. It appears, however, that two of the debits to Mr. Lenzini have already been allowed by respondent as training fees and are within the stipulated expenses.A $307 payment to Mr. Torres, recorded on the account statement for June 25, 1966, was not allowed by respondent. Petitioner explained *243 that the $307 to Mr. Torres represented, when combined with $50 paid to him three days earlier, the jockey's 10 percent of the purse won by the horse he raced. The payment of 10 percent to the winning jockey was a common horse racing practice, and the statement reflects that the horse rode by Mr. Torres won $3,575 on June 22, 1966, the date the $50 was paid to him. We therefore allow petitioner an additional deduction of $307. The check to Mr. Lenzini for $208, which was the final entry on the Delaware Racing Association account statement, appears to have been simply one of the checks issued to close out the account. Testimony with respect to other horseman's accounts which petitioner had indicates that money taken out when an account was closed was most likely not kept by Mr. Lenzini as his trainer's fee or used to pay expenses but was redeposited in a different horseman's account at another track. Accordingly, the only additional deduction we allow with respect to the debited entries on the Delaware Racing Association statement is for the $307 paid to Mr. Torres. Petitioner testified that three checks made out to Al Busook and nine made out to Arthur Steiner were for the payee's *244 shares of winnings from horses they owned in partnership with petitioner. But there is nothing in the record showing whether their shares of the winnings were ever included in petitioner's income. We therefore deny the deduction of these checks. Petitioner testified that several of the checks he submitted were indirect payments to Paul Harol, one of his trainers. Petitioner said he made out the checks to third parties at the direction of Mr. Harol rather than paying them to Mr. Harol himself. Petitioner's recollection with respect to some of these checks appeared to be little more than conjecture. Mr. Harol testified but did not support petitioner's claim that the checks were paid at his behest. He did not confirm any of petitioner's statements as to the relation of the payees to the horse racing business. We therefore deny any deduction with respect to checks petitioner claims were paid at the direction of Mr. Harol. Checks and Receipts Allegedly Relating to Business Travel and Entertainment
The record establishes that petitioner attended many regional and national CICA meetings during the years in issue and that his wife accompanied him on some of these trips. The business *245 purpose for petitioner's taking such trips is obvious, but only on the few occasions when she went to CICA on matters relating to her bookkeeping duties would there be a business purpose for Mrs. McCue's travel. Petitioner also testified that he and his wife engaged in substantial travel in relation to the horse racing business. They traveled to various racing tracks and stables to observe horses they owned and to try to locate other horses to purchase. Because Mrs. McCue was quite involved in the horse racing business, her accompanying him on these trips served a valid business purpose. On some of these trips, petitioner entertained contacts in the racing business.
We have no difficulty finding that petitioner and his wife took many trips on which deductible travel and entertainment expenses were incurred. But respondent has allowed many expenses to be deducted, based on receipts and other records obtained from petitioner. The only controversy now before us concerns travel and entertainment expenses supported only by records that were rejected by respondent as not satisfying the substantiation requirements of section 274(d). We have already rejected petitioner's claim that a *246 deduction may be allowed based upon a rough estimation of aggregate business expenses. At trial petitioner submitted many of the checks and receipts that had been considered by respondent to be inadequate substantiation. The checks and receipts are certainly not sufficient in themselves to establish all the required elements of substantiation--amount, time, place, and business purpose, which are specified in section 1.274-5(b) (2) and (3), Income Tax Regs. However, the taxpayer may substantiate deductions in appropriate cases through a combination of his own testimony and other corroborative evidence, such as receipts. Section 1.274-5(c) (3), Income Tax Regs.The testimony and evidence when considered together must be sufficient to specifically establish each of the required elements for each claimed expenditure. See Dowell v. United States,522 F.2d 708 (5th Cir. 1975). [9]
When reviewing the checks at trial, petitioner was sometimes able to recall the specifics of the particular trip and its purpose, thus satisfying this alternative substantiation method. With respect to other checks, however, his recollection was hazy and he *247 admitted he was not sure. Based on our review of the checks and receipts in the light of petitioner's testimony, we conclude the following additional travel expenses should be allowed: Date
Payment To
Amount
July 31, 1968
Allegheny Airlines
$60.90
June 4, 1968
Allegheny Airlines
110.25
April 20, 1968
Allegheny Airlines
94.50
Oct. 14, 1968
Annapolis Terrace Motel
24.72
Dec. 20 & 21, 1968
Valencia Motel
36.54
March 16, 1968
Valencia Motel
11.00
April 21, 1967
Executive Motor Hotel
40.43
May 30, 1966
Sportsmen Motor Lodge
14.42
March 20, 1966
Airport Lobster Pool
54.35
Dec. 9, 1967
National Airlines
64.26
Sept. 19, 1967
United Airlines
66.05
May 24, 1967
Allegheny Airlines
29.14
Feb. 5, 1966
Eastern Air Lines
128.52
March 28, 1966
Allegheny Airlines
58.28
March 19, 1966
Allegheny Airlines
58.28
Dec. 10, 1965
Eastern Air Lines
51.03
April 19, 1965
American Airlines
77.33
March 11, 1965
Eastern Air Lines (two
30.03
tickets)
30.03
Feb. 2, 1965
Allegheny Airlines
29.14
March 10, 1965
Allegheny Airlines
13.91
July 28, 1965
American Airlines
55.86
Aug. 1965
Trans World Airlines
25.88
Oct. 5, 1967
Holiday Motor Hotel
76.82
Deductions should also be allowed for $106.08 paid to the Yankee Clipper Inn on January 9, 1966, and $153.16 paid to The Cavalier on July 3, 1968, *248 but these amounts should be reduced by 20 percent because they were for motel rooms where both Mr. and Mrs. McCue stayed during CICA meetings and there was no business purpose established for Mrs. McCue's attendance at these meetings. Addition to the Tax for Fraud
Respondent has the burden of proving fraud and must establish it for each taxable year by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. To prove fraud, respondent must establish an intentional wrongdoing on the part of the taxpayer, motivated by a specific purpose to evade a tax known or believed to be owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be determined upon consideration of the entire record. Stratton v. Commissioner,54 T.C. 255, 282 (1970). Because direct evidence of fraud is seldom available, it is common for circumstantial evidence to be relied upon in proving a fraud case. Powell v. Granquist,252 F.2d 56, 61 (9th Cir. 1958); Grosshandler v. Commissioner,75 T.C. 1, 19 (1980). Here, there *249 are many factors supporting respondent's finding of fraud. Petitioner failed to file income tax returns for each of the years in issue. With respect to 1967 and 1968, petitioner's nonfiling is conclusively established by his plea of guilty under section 7203 to the crime of willfully failing to file returns for those years. The record clearly shows that petitioner filed no returns from at least 1950 through 1968. Petitioner allegedly had encountered problems with the Internal Revenue Service when he filed a return when he was only 16 or 17 years of age.In reaction to what he felt was unjust harassment by the Internal Revenue Service with respect to that return, petitioner claimed that he avoided filing returns in subsequent years. Petitioner testified that he deliberately went to work on salary at one point in the early 1950's so that tax would be withheld. He thus paid tax but avoided the necessity of filing a return. However, since at least 1955, when he was assigned by CICA to sales in Pennsylvania, petitioner has not received a salary and has not had taxes withheld by his employer. Neither the plea of guilty under section 7203 nor the pattern of nonfiling returns during *250 the period from 1950 through 1968 automatically proves that the nonfiling was due to fraud. But it has been consistently recognized that failure to file may properly be considered in conjunction with other factors in determining whether an underpayment of tax is due to fraud. E.g., Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982). An extended pattern of nonfiling plus some "'convincing affirmative indication'" of the requisite specific intent to defraud warrants imposition of the fraud addition to the tax. Stoltzfus v. United States,supra at 1005; Grosshandler v. Commissioner,supra at 19. This may be done without proving the existence of an affirmative act, the strict standard applied to criminal fraud cases. Stoltzfus v. United States,supra at 1005, n.6. The Stoltzfus case was quite similar to that now before us since it involved a taxpayer who had filed no returns over a 15-year period. The Third Circuit found that the taxpayer's educational and business background, his filing of returns in two prior years, and the amount of gross income for the years of nonfiling were sufficient to support the conclusion that the taxpayer had no reasonable basis for believing that *251 taxes were not owed. This was a sufficient "affirmative indication" to support finding fraud, when viewed in conjunction with the pattern of nonfiling. Here, petitioner was a successful district manager of a major insurance company, responsible for training and supervising a large number of individuals. He obviously had the type of business background that would normally cause an individual to be fully aware of his duty to file income tax returns. He admitted that he knew people filed income tax returns and he filed a return himself early in his working career. His testimony as to arranging to be placed on a salary confirms that he understood that he had a tax obligation. Given the significant amounts of gross and net income we have found he received in each of the years in issue and the fact that no taxes were withheld or prepaid, there is no basis for his claiming he believed he did not earn enough money to require his filing returns. Cf. Cirillo v. Commissioner,314 F.2d 478, 483 (3d Cir. 1963), affg. in part and revg. in part a Memorandum Opinion of this Court. These facts are quite similar to those in Stoltzfus v. United States,supra, and indicates that petitioner's nonpayment *252 of income tax was due to fraud. Moreover, there is positive evidence that petitioner understood the consequences of his pattern of nonfiling and nonpayment of taxes but chose to continue evading taxes. Because Dr. Warren J. Muhlfelder, an expert witness testifying for petitioner, relied in part in forming his impression of petitioner's mental state on the transcript of an interview between petitioner's attorneys, petitioner, and his wife, which was conducted on June 17, 1971, the attorney-client privilege with respect to this transcript was deemed waived and it was admitted into evidence. [10] *253 The interview transcript reveals that on several occasions during the years in issue petitioner recognized that he had a serious tax problem and sought help in resolving it. Petitioner's testimony at trial confirmed these events. In 1965 or 1966, petitioner contacted Congressman Dan Flood and explained that he had a "friend" with serious tax problems, but the Congressman would not get involved. Petitioner also talked to Congressman George Goodling and explained that he had a problem due to his not having paid taxes for may years and that he needed advice and help. Congressman Goodling told petitioner that he, like everyone else, should pay his taxes. An associate of the Congressman advised petitioner to see an attorney. Thereafter, in 1966 or 1967, petitioner told an attorney to whom he had sol insurance that he had not paid taxes in years. After this attorney referred petitioner to the District Attorney in Harrisburg, petitioner tried several times to make an appointment with *254 the District Attorney but never saw him. Shortly thereafter, in early 1967, petitioner received a letter from respondent focusing on a particular problem concerning the cost of a house that he had sold. Petitioner then went to a different attorney, who handled this particular problem. Petitioner explained to him his history of nonfiling. This attorney advised petitioner to file his returns. He also referred him to a psychiatrist, Dr. Richard A. Crandall, and to his current attorneys. These attempts by petitioner to get help in resolving his tax problems during the years in issue suggest that he understood his plight and was afraid that his commencing the filing of returns would trigger respondent's discovery of his pattern of nonfiling. Instead of risking such discovery, during the years in issue petitioner continued to hope he could successfully evade taxes by failing to file any returns. In the light of the facts disclosed in the interview transcript as well as the affirmative indications of fraud discussed earlier, we find that respondent has made a prima facie case that the fraud addition to the tax is warranted in each of the years in issue. Petitioner attempts to counter *255 the strength of respondent's evidence by relying on testimony directed at his lack of mental capacity to formulate the specific intent to evade a tax known or believed to be owing. He relies primarily upon the expert testimony of Dr. Muhlfelder, a psychiatrist who examined petitioner twice in 1978. These two examinations, which together lasted only about four hours, took place almost 10 years after the latest of the taxable years in issue. Despite this lapse of time, Dr. Muhlfelder believed that he was able to accurately evaluate petitioner's mental condition during the years in issue, based on his examination of petitioner and his review of previously prepared written materials. These materials reviewed by Dr. Muhlfelder were sketchy notes made by Dr. Crandall, a now deceased psychiatrist who had treated petitioner during some of the years in issue, and written transcripts of interviews conducted by petitioner's attorneys with Dr. Crandall, petitioner and Mrs. McCue. It was Dr. Muhlfelder's opinion that petitioner was suffering during the years 1964 through 1968 and was still suffering in 1978 from a form of schizophrenia, with paranoid elements. Dr. Muhlfelder testified that, *256 although petitioner was in many ways logical and completely able to function, in other ways he was illogical and disorganized and believed that what applied to the rest of the world did not apply to him. Specifically, Dr. Muhlfelder felt that petitioner was mentally ill in believing that the tax laws did not apply to him and that he did not need to file returns. Petitioner had, according to the psychiatrist, a specific disregard for his obligation to pay taxes and did not appreciate the difference between right and wrong in this respect. Dr. Muhlfelder also believed that petitioner suffered from paranoia in that he believed persons were out to get even with him. Among these were the Internal Revenue Service. Despite Dr. Muhlfelder's apparently sincere belief in the correctness of his diagnosis, we cannot help but be skeptical and no assign it little weight, based on the fact that it was conducted 10 years after the latest of the years in issue and that petitioner knew that the psychiatric examination was being conducted in relation to the tax charges against him and at the direction of his attorneys. It cannot escape our attention that in most respects petitioner functioned as *257 a normal individual, although he certainly had some problems dealing with paperwork and with persons in authority. The Federal tax laws were the only area where Dr. Muhlfelder found that petitioner could not distinguish right from wrong. We find it hard to accept that an individual as successful as petitioner would function efficiently in the business world, as his own testimony and that of CICA officials has established, but still be so mentally ill that he could not appreciate the duty to pay taxes. In this respect, we think it is relevant that petitioner had considerable tension and disagreement with CICA and its administrative officers. Yet, these conflicts were resolved or ignored and petitioner was able to fulfill his duties to the company, in part through his wife's record keeping activities. Other than Dr. Muhlfelder's testimony there is nothing in the record to suggest that petitioner's opposition to filing tax returns was significantly stronger than his aversion to performing the administrative tasks imposed by CICA. Indeed, petitioner and Mrs. McCue often stressed petitioner's complete aversion to performing personally any record keeping or other administrative responsibilities *258 and yet be toed the line with the company, although not perfectly, which suggests he could have likewise fulfilled his duty to pay his taxes had he chosen that course.Instead, he "blocked out" of his mind his obligation to file returns. Dr. Muhlfelder saw this as a symptom of petitioner's sickness, but to us petitioner's own testimony indicates there was a volitional aspect to his blocking out his duty to pay taxes, based on his desire simply not to deal with it. Furthermore, Dr. Muhlfelder's diagnosis does not adequately account for the fact disclosed in the interview transcript that petitioner sought help with his tax problems on several occasions during the years in issue. The several contacts by petitioner with people who might have helped him resolve his tax problems suggest that petitioner was not so out of touch with reality during the years in issue that he was unaware of his obligation to pay taxes. Dr. Muhlfelder found no inconsistency between his diagnosis of petitioner and petitioner's seeking help with his tax problems. He saw petitioner's seeking advice as not an admission by petitioner to himself that he was obligated to pay taxes but as an attempt to get help *259 with what he considered baseless persecution by the Internal Revenue Service, which was an aspect of his paranoia. But Dr. Muhlfelder also explained that an individual with petitioner's type of schizophrenia would have periods of remission in which he would no longer be sure that he was above the law.Remissions could last for years. When pressed, Dr. Muhlfelder admitted that it was possible that petitioner was moving toward a remission when he contacted individuals to help him with his tax problems and had doubts as to whether his failure to pay taxes was right or wrong. Recognizing that petitioner may have been in remission at times during the years in issue, Dr. Muhlfelder admitted that he was unable to ascertain how long a time period during the years in issue or when that time period may have taken place (if it did) that petitioner was unable to appreciate his duty to pay taxes. The positive evidence presented by respondent as to petitioner's understanding during the years in issue of his duty to pay taxes, when coupled with the psychiatrist's inability to ascertain when petitioner was out of touch with reality, compels us to disregard the psychiatrist's expert opinion as to *260 petitioner's mental state during the years in issue. Petitioner may well have suffered and still be suffering from some form of mental illness but the record before us simply does not indicate that he had no appreciation during the years in issue of his duty to pay taxes and file returns. Instead, it suggests that he chose to continue his practice of failing to file returns, which had been successful for many years, recognizing that he was neglecting his duty to pay taxes. A taxpayer's evasive, uncooperative and dilatory conduct during the course of respondent's investigation can be further evidence of fraud. Estate of Beck v. Commissioner,56 T.C. 297, 365 (1971); Vise v. Commissioner,31 T.C. 220, 226 (1958), affd. 278 F.2d 642 (6th Cir. 1960). Such lack of cooperation is present in this case. When initially contacted by the special agent, petitioner's attorneys refused to answer directly whether petitioner had filed returns for the years under investigation but implied that returns had been filed but must have been lost by respondent. Thereafter, during the course of the criminal investigation petitioner, through his attorneys, steadfastly refused to furnish any records *261 or meet with respondent's agents. On July 24, 1974, the Criminal case was closed and the revenue agent recommenced his civil tax audit. Petitioner's attorneys persisted in their refusal to furnish any records to respondent and would not permit the revenue agent to interview petitioner, alleging that it would be too great a strain. The agent therefore had to resort solely to third-party records in reconstructing petitioner's income. The statutory notice was based on this reconstruction. Subsequent to the filing of the petition in this case, petitioner's attorneys agreed to provide records. Belatedly, they delivered to respondent two good-sized cardboard boxes containing petitioner's disorganized and incomplete records for the years in issue.There were no formal books recording petitioner's income and expenses, but only informal records such as canceled checks and receipts. Even after these records were furnished, petitioner continued to refuse to meet with the agent or attorney handling the case. Indeed, respondent's representatives never met petitioner until the trial of this case was conducted. Based upon our review of the entire record, including petitioner's testimony and *262 his demeanor on the witness stand, we are constrained to conclude that petitioner's conduct throughout the audit and trial reflected his understanding of Dr. Muhlfelder's anticipated testimony and his efforts to fit the pattern which hopefully would excuse his fraud. We noted lapses in petitioner's facade of lack of knowledge of and interest in record keeping. We also noted petitioner's clear understanding of CICA's record keeping and rule abiding requirements and his intentional ignoring of those restrictions when he felt it was in his business interest to do so. We are convinced and so find that petitioner knew long prior to the years in issue that he was evading his tax obligations and that he knowingly and intentionally continued that practice, presumably in the hope that what had worked in the past would continue to work. It was only when petitioner became convinced by his own tax advisors that he could no longer evade his tax obligations that he agreed to file returns. Whether or not petitioner's pattern of tax evasion was originally motivated in whole or in part by an emotional illness cannot now be ascertained. We do not totally dismiss Dr. Muhlfelder's diagnosis. We *263 simply do not find that his testimony is sufficiently convicing as to the period before us, 1964 through 1968, to counter the otherwise clear and convincing evidence of petitioner's fraudulent conduct.[11] Thus, we sustain respondent's assertion of additions to tax under section 6653(b) as to the redetermined deficiencies for each year. In addition to the section 6653(b) additions to tax for fraud, respondent determined that petitioner was liable for additions to tax under section 6654 for failure to pay estimated tax in each of the years in issue. We have found that petitioner paid no estimated tax in any of these years although he was clearly required to do so. We therefore hold that he is liable for the mandatory section 6654 additions to the tax for each of the *264 years in issue. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue.↩
2. Petitioner has submitted several checks and receipts and asks that we allow deductions for travel, meals, lodging and entertainment that he claims these substantiate. These specific claims are discussed later in the opinion.↩
3. Petitioner does not contest the amount of gross income determined for 1966 based on the earnings report. This report listed overwrites of $65,200.57 plus approximately $5,000 of other payments, some of which may also have been overwrites. The earnings report also listed a negative figure of $24,911.40, which corresponded to amounts listed as paid to sales managers in petitioner's district as overwrites or bonuses. This $24,911.40 figure was subtracted from the overwrites and other payments in computing petitioner's total earnings for 1966. For 1967 and 1968, CICA furnished earnings reports in addition to the Forms 1099. On these reports, however, no amounts were subtracted for overwrites and bonuses paid to sales managers, and the total earnings figure was the same as the gross income reported on the Forms 1099 issued to petitioner.
4. This one-third figure is consistent with the entries on the 1966 earnings report, which showed $24,911.40 of bonuses and overwrites paid to sales managers, and at least $65,200.57 of overwrites paid to petitioner. There is no explanation why CICA had the figures for overwrites and bonuses paid to managers in petitioner's district in 1966 but had no similar figures for the other years in issue.↩
5. Sec. 274(b)(1) limits the expenses for gifts that can be deducted under sec. 162 or 212, and sec. 274(d)(3) imposes substantiation requirements on the gifts that are deductible. These provisions do not apply to the prizes and awards petitioner gave to his sales personnel. For purposes of sec. 274, the term "gift" is defined generally as items excludable from the gross income of the recipient under sec. 102 and not excludable from gross income under any other I.R.C. provision. Sec. 274(b)(1); sec. 1.274-3(b)(1), Income Tax Regs.↩ Since the prizes and awards involved here are compensation includable in the sales agents' and managers' gross income, rather than gifts excludable under sec. 102, sec. 274 does not apply to petitioner's deduction of these payments.
6. In Bodzin v. Commissioner,509 F.2d 679 (4th Cir. 1975), revg. 60 T.C. 820 (1973), the Court of Appeals denied the taxpayer a home office deduction because he merely, "by choice," chose to work at home during the evening or on weekends and did not show that the office supplied by his employer was unavailable during those times.Thus, the court found, his expenses were of a personal, not a business, nature. 509 F.2d at 681. This clearly is not the case here, where there is no indication that petitioner voluntarily undertook to use a portion of his home for CICA business or that CICA provided space elsewhere for petitioner's use. Cf. Sharon v. Commissioner,66 T.C. 515 (1976), affd. 591 F.2d 1273↩ (9th Cir. 1978). 7. There was no requirement during the years at issue that a room be used exclusively for business purposes in order to deduct a portion of the expenses attributable to its business use. See Oppenheim v. Commissioner,T.C. Memo. 1973-12. In 1976, sec. 280A became effective, severely limiting the deductibility of home office expenses by, among other things, requiring that an "exclusive use" test be met except under certain circumstances. That section is not, however, applicable to this case.
8. While Mrs. McCue testified that business records were stored in a portion of the basement where the laundry area also was located, we cannot ascertain from the record what portion of the basement these boxes occupied. Therefore, petitioner is entitled to no deduction for the other one-half of the basement.↩
9. See also Lennon v. Commissioner,T.C. Memo. 1978-176↩.
10. In our order, dated Nov. 15, 1982, which allowed the interview memorandum to be admitted into evidence and used by respondent's counsel in cross-examining petitioner and Dr. Muhlfelder, we commented that disclosure of the interview transcript was governed by Rule 705, Federal Rules of Evidence, which provides that the Court may require an expert to disclose on cross-examination the facts or data underlying his or her opinion testimony. We comented that under Rule 705 the Court has discretion to require disclosure of underlying documentation and that Rule 705 overrides the attorney-client privilege when, as was done in this case, a party implies an intent to waive the privilege by presenting testimony based on the attorney-client communication. See Alexander v. State,358 So. 2d 379, 385-386↩ (Miss. 1978).
11. We think the rule is clear, the Tax Court is not bound by the conclusory statements of any witness, even an "expert." The Court must look at the substance of a witness' testimony as well as his conclusions. The testimony must be weighed along with all other relevant evidence. South Texas Rice Warehouse Co. v. Commissioner,366 F.2d 890, 898 (5th Cir. 1966), affg. 43 T.C. 540 (1965), cert. denied 386 U.S. 1016↩ (1967).